[Cite as *In re T.G.*, 2014-Ohio-5569.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| | | CASE NOS. CA2014-07-101 |
| T.G., et al. | : | CA2014-08-106 |
| | : | O P I N I O N |
| | | 12/19/2014 |
| | : | |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 13-D000011

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children Services

Lauren L. Clouse, 7681 Tylers Place Blvd., Suite 3, West Chester, Ohio 45069, for appellant, Paul G.

Timothy McKenna, 125 East Court Street, Suite 950, Cincinnati, Ohio 45202, for appellant, Chrisinda G.

Andrea Ostrowski, 20 South Main Street, Springboro, Ohio 45066, guardian ad litem

**PIPER, J.**

{¶ 1} Appellants, biological mother and father of T.G. and J.G., appeal from a decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of T.G. and J.G. to a children services agency.

{¶ 2} Warren County Children's Services (agency) filed a complaint on March 1, 2013

alleging that T.G. and J.G. were abused and dependent children. The complaint indicated that when both children were present, father threw a water bottle through a kitchen window during an argument with mother. When mother reported the incident, father voluntarily left the home. Mother also reported father had previously choked her in front of the children. The agency had protective supervision of T.G. at the time and T.G. had previously been adjudicated dependent. This first case with T.G. was extended twice by the court at the request of the agency. Because the time limit set for the case involving T.G. had already passed, a new case was filed by the agency for both T.G. and J.G. At this time, the children remained with mother under protective supervision.

{¶ 3} On May 13, 2013, T.G. and J.G. were adjudicated dependent and placed in the temporary custody of the agency after mother lost housing. A case plan was issued regarding both children and required mother and father to attend parenting education and training, complete a parenting assessment, utilize financial support and budget training, demonstrate financial ability to provide for the children, and provide stable housing. Specific to mother's case plan, she was to complete classes with a crisis shelter and comply with mental health treatment. Father was to complete anger management classes. The agency filed for permanent custody of the children on February 7, 2014. A hearing by the juvenile court was held on the permanent custody motion on May 12, 2014, May 19, 2014, and July 9, 2014.

**Caseworker's Testimony – Background**

{¶ 4} At the hearing, the agency presented the testimony of a caseworker, who testified regarding agency involvement in both the first case concerning only T.G. and the current case including both T.G. and J.G. In the first case, the agency became involved when mother checked herself into a hospital for mental health reasons and left T.G. with an inappropriate caregiver. Mother also did not provide enough supplies for the caregiver to

adequately provide for T.G. during mother's absence. T.G. could not be placed with father because there was a restraining order against him at the time. On February 28, 2011, T.G. was placed in emergency shelter care. On April 22, 2011, T.G. was adjudicated dependent because of domestic violence issues between mother and father and instability. At a dispositional hearing on May 27, 2011, T.G. was ordered to remain in the agency's temporary custody with the goal of reunification with the parents.

{¶ 5} The caseworker testified that during the first case, substantial progress was made by both parents to warrant altering visitation from supervised to unsupervised. Generally, case plan requirements were met and there were no new problems with mother's mental instability or domestic violence. However, father attended ordered counseling sporadically and the couple struggled to afford housing. The caseworker testified that mother was engaged in mental health services. Nevertheless, the caseworker testified that stability within the family was still lacking, so the agency filed its first extension in the first case.

{¶ 6} The caseworker stated that in May 2012, visits reverted to supervised after father and mother engaged in a verbal altercation during an unsupervised visit with T.G. During the now supervised visitation, the caseworker observed that with some direction, mother engaged in age appropriate activities with T.G. when she would sit on the floor and play with him. However, the caseworker testified that the engagement was not consistent and mother would often sit on the couch and read a magazine. When the caseworker observed father at supervised visits with T.G., father would sit next to T.G. on the floor, but would not engage him at an appropriate age level. Even when T.G. would try to hand father a ball, father would minimally respond.

{¶ 7} The caseworker testified that around the time the agency filed a second extension in the first case, she wrote a letter to the parents addressing the agency's concerns in order to pointedly inform them of how to reunify with T.G. The caseworker testified that

she read the letter to the parents and asked if they had questions. Mainly, the agency was concerned with the parents gaining permanent housing, engaging in mental health services, and maintaining a violence-free home. Additionally, the caseworker noted that it took six months for the parents to engage in couples counseling after a case plan modification.

{¶ 8} According to the caseworker, by November 2012, the parents once again showed substantial progress in their case plans in order to change visits with T.G. from supervised to unsupervised. By this time, J.G. had been born and was approximately eight months old. The caseworker observed the parents struggling to take care of both children. Mother often called the agency or T.G.'s foster mother for help as mother had a very low threshold before becoming frustrated.

{¶ 9} Again, by February 2013, substantial progress had been made by the parents, enough to place T.G. in their home with protective supervision by the agency. The caseworker testified that the parents had been in the same residence for almost six months, mother was working, and there were no reports of domestic violence. As such, the agency had no safety concerns at the time.

### Caseworker's Testimony - Current Case

{¶ 10} By March 2013, however, a new case was filed by the agency alleging that both T.G. and J.G. were abused and dependent as a result of another domestic violence incident where father threw a water bottle through the kitchen window. The caseworker testified that in addition to father throwing the water bottle, there had been an instance where father admitted choking mother after she allegedly hit him. Initially after the domestic violence reports, mother retained custody of both children with protective supervision by the agency after father had left the home. By May 2013, however, mother had lost her housing and father was seeing the children without supervision in violation of a court order.

{¶ 11} After receiving ex-parte custody of the children in early May 2013, the agency

received temporary custody at the end of May after the children were adjudicated dependent. The caseworker testified that the parents received supervised visitation. During visitation, mother would often tell father to do things like change J.G.'s diaper and would sometimes play on the floor with the children. However, the play was more side-by-side interaction, like between two children. Both father and mother would engage in separate activities from the children, such as coloring while the children watched television. The caseworker testified that the parents would often spend the visits making food and feeding the children, but that the snacks were not always age appropriate.

{¶ 12} The caseworker testified that at about this time mother was not attending mental health treatment and stopped taking her medication. The caseworker testified that mother believed she no longer needed mental health treatment because she was taking karate and seeing a sensei. Additionally, the caseworker testified that around July 2013 mother's mental health was decomposing such that she was making comments about the children being of mixed purple and blue blood and they were of nobility. According to the caseworker, mother also stated that she was a ninja and working undercover for the FBI.

{¶ 13} The caseworker testified that father was to complete anger management courses as a part of the case plan. While father eventually completed the courses, it took him approximately six months to complete a six-week program. The caseworker testified that father used transportation and cost as an excuse, but the agency paid for the majority of the cost of the service. Additionally, the caseworker stated that father never completed portions of his counseling regarding pharmacological management. The caseworker also testified that she was concerned with father's domestic violence issues as reflected in continued police reports.

{¶ 14} The caseworker further testified that mother had difficulty maintaining employment and the parents had lived at approximately 14 different residences since her

involvement in the case. Furthermore, their current housing is only a result of a two-year grant, and as such, they will eventually have to pay more of the rent. While mother had temporarily stopped receiving a form of social security, both mother and father now receive social security income. Both T.G. and J.G. were placed with the same foster mother who also took care of T.G. when the agency had temporary custody of him in the first case. The caseworker testified that while T.G. and J.G. were in the foster mother's care, she observed the children behave as one would expect for children of their ages. The caseworker testified that she was not in favor of extending the existing case for a second time because of her concerns regarding the safety of the children if they were to return home and her belief that the children needed permanency.

**Testimony of Court Psychologist and Mental Health Worker**

{¶ 15} Dr. Rebecca Brewer, a former court psychologist, and Tierra Smith, a case manager employed where mother received mental health services, also testified. Dr. Brewer stated that father had Depressive Disorder NOS, Expressive Language Disorder, and Borderline Intellectual Functioning. With this diagnosis, Dr. Brewer expressed concerns about father's ability to care for the children, especially as they grew older as adolescents could easily manipulate father and subject themselves to unsafe situations. Dr. Brewer expressed concerns about mother's mental health, as mother had been hospitalized approximately ten times and her mental health decomposes each year. As such, there are significant periods of time when mother would not be able to take care of children or make sure they are safe. Smith testified that she began seeing mother for her mental health in February 2011, but stopped seeing her in February 2012 because mother had moved out of county even though mother still needed the services. At some point, mother began seeing another case manager and Smith resumed seeing mother at the beginning of 2014. In Smith's opinion, mother is still benefiting from case management. Neither parents'

counseling case was ever closed.

{¶ 16} The testimony of father and mother revealed that they recently have resided in at least eight or nine residences and have been evicted from three. Currently, they live in subsidized housing in a two-bedroom, one-bath apartment, but will only receive grant money for another year to maintain this housing. While mother had her social security disability revoked, she is now receiving supplemental security income. It is undisputed that mother has been hospitalized twice in the last three years for her mental illness, police involvement was required for domestic violence issues with both parties, and the parents did not always follow through with case plan requirements.

{¶ 17} After considering all of the evidence, the juvenile court granted permanent custody of the children to the agency. The parents now appeal the court's decision to grant permanent custody to the agency and each raise a separate assignment of error. For ease of discussion, we will address mother's and father's assignments of error together.

{¶ 18} Mother's Assignment of Error:

{¶ 19} THE TRIAL COURT ERRED AS A MATTER OF LAW BY GRANTING THE MOTION FOR PERMANENT CUSTODY, AND MOTHER'S DUE PROCESS RIGHTS WERE DENIED BY CHILDREN'S SERVICES [sic] NOT REQUESTING AN EXTENSION OF TEMPORARY CUSTODY.

{¶ 20} Father's Assignment of Error:

{¶ 21} THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO WARREN COUNTY CHILDREN SERVICES.

{¶ 22} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). An appellate court's review

of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re Starkey*, 150 Ohio App.3d 612, 2002-Ohio-6892, ¶ 16 (7th Dist.). A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *In re Rodgers*, 138 Ohio App.3d 510, 520 (12th Dist.2000).

{¶ 23} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: the child is abandoned; the child is orphaned; the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a), (b), (c) and (d); *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139 and CA2009-11-146, 2010-Ohio-1122, ¶ 22.

{¶ 24} The juvenile court found by clear and convincing evidence, and the parents do not dispute, that T.G. has been in the temporary custody of the agency for more than 12 months of a consecutive 22-month period as of the date the agency filed the permanent custody motion. However, the parents do dispute the juvenile court's finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, as J.G. has not been in agency custody for the requisite period of time. Additionally, mother asserts that the court should have granted an additional six-month extension in the second case.

**Placed with Either Parent within a Reasonable Time**

{¶ 25} If a court determines by clear and convincing evidence that any of several findings under R.C. 2151.414(E) exist as to the parents, the court shall enter a finding that the children cannot or should not be placed with either parent within a reasonable time. The juvenile court found that pursuant to R.C. 2151.414(E)(1), the parents failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside of their home. The court found specifically that both parents failed to utilize rehabilitative services and material resources made available to them by the agency in order to productively alter their parenting behavior. Father failed to complete case plan objectives and his continued relationship with mother often leads to violence. Mother also has failed to complete case plan objectives and has a history of mental health issues. Contact between the parties is often in violation of court orders. Additionally, the parents struggle with age-appropriate behaviors with the children and exhibit parenting concerns.

{¶ 26} Although not determinable as to T.G., we will address the court's finding as to both children. Pursuant to R.C. 2151.414(E)(2) the juvenile court found that mother has a chronic mental illness that prevents her from providing an adequate and permanent home for the children. Additionally, her symptoms are exacerbated by infrequent use of medication. The juvenile court found pursuant to R.C. 2151.414(E)(4) that the parents have shown a lack of commitment to their children by failing to provide permanent housing. The court found that the parents lived at no less than nine residences during the pendency of the two cases. Finally, pursuant to R.C. 2151.414(E)(14) the trial court found that the parents show a systematic unwillingness to provide shelter and other basic necessities for the children as demonstrated by a lack of compliance with the case plan. The parents struggle budgeting money, understanding safety issues, and prioritizing the children's needs.

{¶ 27} Both parents exhibited inconsistencies in complying with case plan requirements. While in some instances they appeared to be making progress, the changes

- 9 -

were not always in a forward trajectory. While currently living together in a two-bedroom apartment that appears guaranteed as stable housing for another year, they have a history of obtaining and then losing housing. Furthermore, while the couple remains together, there continues to be angry outbursts and domestic violence issues. Finally, mother's mental health issues have caused her to be hospitalized numerous times over the past ten years, with two hospitalizations occurring since 2011. Lack of stable housing, police involvement in domestic violence disputes, violation of court orders, and mother's mental health issues remained concerns throughout the case that continue to pose problems regarding the placement of T.G. and J.G. into their care. Consequently, we find that there is not a sufficient conflict in the evidence to say that the trial court erred in finding by clear and convincing evidence that either child could not be placed with either parent within a reasonable time.

{¶ 28} Additionally, we note that while mother argues the juvenile court erred by failing to grant a second six-month extension for the case, there is no indication such a motion was before the court. In any event, the juvenile court's decision to grant or deny an extension of temporary custody is a discretionary one. *In re E.T.*, 9th Dist. Summit No. 23017, 2006-Ohio-2413, ¶ 79, citing R.C. 2151.415(D)(1) and (2). The statute only authorizes the court to extend temporary custody for an additional six months if it finds, by clear and convincing evidence, that such an extension is in the best interest of the children and that "there has been substantial additional progress since the original extension of temporary custody toward reunifying the child with one of the parents * * *" and "there is reasonable cause to believe that the child will be reunified with one of the parents * * * before the expiration of the additional extension period." R.C. 2151.415(D)(2). Given the parents' pattern of behavior and the juvenile court's finding that the children could not be placed with either parent within a reasonable time, there is not reasonable cause to believe that the children would have been reunified with mother or father within the time period of a second extension if such a

motion had been filed.

### Best Interest

{¶ 29} Additionally, the parents dispute that granting permanent custody of the children to the agency is in the children's best interest. R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 30} With respect to R.C. 2151.414 (D)(1)(a), the juvenile court found that the children were placed in a stable, licensed foster-to-adopt home and established relationships with the foster mother. With respect to R.C. 2151.414(D)(1)(b), the juvenile court indicated that the children are too young to express their wishes.

{¶ 31} With respect to R.C. 2151.414(D)(1)(c), the juvenile court found that T.G. initially entered the agency's custody and was placed in foster care on February 28, 2011.

- 11 -

After a year and one-half of being in foster care, T.G. was placed back into the parents' home and the parents had to call foster mother at times to aid in his care. During T.G.'s time with his parents, his behaviors deteriorated. On May 8, 2013, T.G. was placed back into his previous foster home when the agency was again granted custody.

{¶ 32} With respect to R.C. 2151.414 (D)(1)(d), the juvenile court found that the children's need for legally secure placement cannot be achieved without granting permanent custody of the children to the agency. The parents are unable to meet the needs of the children and failed to remedy conditions resulting in their removal. As such, neither parent can be reunified with either child within a reasonable time. Furthermore, the children have adapted in their foster-to-adopt placement. Adoption is the best way for the children to achieve a much needed stable home. With respect to R.C. 2151.414 (D)(1)(e), the juvenile court found there were no other factors to consider in division (E)(7) to (11) of R.C. 2151.414.

{¶ 33} Mother asserts that the above best interest factors support T.G. and J.G. living with her as she has made significant progress on her case plan. Similarly, father argues that he has made significant strides in his case plan. Most importantly, both mother and father emphasize their gain of permanent housing and the stabilization of mother's mental health. Nevertheless, given the pattern of the parents' behavior and undisputed evidence of their failure to comply with certain aspects of the case plan, the trial court did not err in finding by clear and convincing evidence that permanent custody was in the children's best interest.

{¶ 34} The history of the parties reveals that they will engage in services for a time, and then stop maintaining the services. This inconsistency has continued since the first case was initiated by the agency in the beginning of 2011. This pattern is also demonstrated in their housing situation. The caseworker testified the parents lived at 14 different residences since she became involved in the case and father admitted to living in at least nine. Additionally, with both parents living in the same house, the potential for domestic violence is

extremely high. Anger management and domestic violence continue to be a problem. Domestic violence calls perpetuated the second removal of T.G. and the grant of temporary custody of T.G. and J.G. to the agency.

{¶ 35} Moreover, mother's case plan required her to comply with mental health treatment. While mother may be currently taking medication for her mental health, she routinely has stopped taking her medication and has a history of her mental health decomposing at a rate of approximately once per year. Father never completed portions of his case plan regarding pharmacological management and he was slow to complete anger management courses. Both father and mother have difficulty understanding age appropriate interaction and behavior with the children. Furthermore, neither parent was successfully released from counseling services. As such, we find that the juvenile court considered the evidence as it related to each of the best interest factors found in R.C. 2151.414(D) and did not err in finding that it is in the best interest of T.G. and J.G. to be placed in the permanent custody of the agency.

{¶ 36} We find no error in the trial court's finding that the children cannot or should not be placed with mother or father within a reasonable time and permanent custody was in their best interest. Accordingly, mother's assignment of error and father's assignment of error are overruled.

{¶ 37} Judgment affirmed.

RINGLAND, P.J., and HENDRICKSON, J., concur.